THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **REHME CUSTOM DOORS &** | § | Case No. 22-50059 |
| **LIGHTING, INC. D/B/A REHME** | § | |
| **STEEL WINDOWS & DOORS,** | § | (Chapter 11) |
| | § | |
| Debtor. | § | |

### DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION

---

**Important Notice:**

The Debtor proposes this Plan of Reorganization as a Small Business Debtor under subchapter V of chapter 11 of the Bankruptcy Code.

All interested parties should read this document carefully and discuss it with their legal and financial advisors.

The Plan may adversely affect you. If you oppose the Plan, you should immediately contact the Debtor to resolve the dispute. If you and the Debtor cannot agree, <u>you must file and serve any objection on or before November 29, 2022</u>. If you do not file a timely response, the Plan may be approved without further notice to you. If you oppose the Plan and have not reached an agreement with the Debtor, you must attend the <u>confirmation hearing set on December 6, 2022 at 12:00 p.m. (CST)</u>. Unless the parties agree otherwise, the Bankruptcy Court may consider evidence at the hearing and may confirm the Plan at the hearing.

Under subchapter V, the Debtor will not solicit votes on the Plan.

Represented parties should act through their attorney.

---

1

## Summary

1. The Company and its 44 employees design and manufacture high-end stainless-steel doors and windows for customers across the State of Texas at a facility in Travis County, Texas. Faced with a siege of costly litigation with some customers over a discontinued product line, the Company sought relief to reorganize through the bankruptcy process.

2. Reorganizing through the bankruptcy process will provide a single forum for addressing the pre-petition litigation claims against the Company in an efficient, more cost-effective, and fair manner. The total amount of claims asserted by litigation claimants appears to exceed available insurance limits. Additionally, there may be a coverage dispute with the Debtor's insurer, which is currently defending litigation against the Debtor under a reservation of rights. Under applicable law, to ensure that all litigation claimants with allowed claims receive the same treatment under the Plan, the Company will marshal insurance coverage for the benefit of all the litigation claimants with allowed claims (the "**Insurance Proceeds**"). In addition to the Insurance Proceeds, the Company will make three annual distributions to unsecured creditors with allowed claims in a total amount exceeding its projected disposable income (as that term is defined herein).

3. Non-insider general unsecured creditors that are not litigation claimants will continue to be paid in the ordinary course of business to the extent they were identified by the Court as critical vendors.

4. The Plan proposes that the Company pay in full a convenience class of general unsecured creditors with *de minimus* claims within 30 days after the Claims Bar Date – that amount is estimated to be less than $2,000.

5. The Company will not solicit votes on the Plan because subchapter V does not require it under these circumstances. The Plan is fair and equitable because distributions exceeding the projected disposable income will be paid to creditors. Further, creditors do significantly better under

the Plan than they would in a hypothetical liquidation. The liquidation value for creditors of the Company's assets is $0. While there is some liquidation value to the assets, those assets are encumbered by a lien securing the DIP Facility, which obligation is significantly higher than the asset value.

### The Company

6. Rehme Custom Doors & Lighting, Inc., (the "**Company**" or the "**Debtor**") and its 44 employees design and manufacture custom, high-end stainless-steel windows and doors primarily for residential applications for customers across the state of Texas.

7. Founded ten years ago, the Company has earned a reputation for excellence and quality. The products are 100% American-made, are fully recyclable and are themselves made from 95% recycled materials.

8. The Company's commitment to the environment extends to the Company's proprietary production processes. Its state-of-the-art manufacturing facility in Travis County, Texas is almost completely solar powered and is near net-zero grid power consumption.

9. The Company uses an industry-leading method of thermally breaking steel that the Company calls "minimized bridging." This technique was developed in-house and successfully patented earlier this year, ensuring the Company's exclusive use of this technology until expiration.

10. The Company's sales have historically varied between $2-3 million annually. Despite a downturn during the pandemic that resulted in losses in 2020 and 2021, demand for the Company's products rebounded quickly and has remained strong. The Company returned to positive operational cash-flow in 2022 and has remained viable as a going concern during the pendency of this case.

11. The Company is owned 100% by Peter J. Rehme, who also serves as the Company's manager, overseeing operations, finances, business relationships, workflow, logistics and strategic

planning. Mr. Rehme's salary pre-petition was $90,000. Mr. Rehme is anticipated to continue as an employee of the Company at the same salary.

12. The Company works alongside three other entities that Mr. Rehme also owns, but that are not debtors or affiliates of the Debtor. Rehme Service Company ("**RSC**") provides delivery and installation services. Rehme Architectural Systems ("**RAS**") handles sales. RSC and RAS pay the Company to provide certain administrative services pursuant to a business service agreement between them. Rehme Investments ("**RI**") owns the manufacturing facility leased by the Company.

13. Mr. Rehme is also a general unsecured creditor, having extended loans to the Company under four separate notes (the "**Rehme Notes**") on which $2,163,679.36 was owed as of September 9, 2022 (the "**Petition Date**").  Any claims or defenses that could be asserted by the Estate with respect to the Rehme Notes are preserved under the Plan to the Litigation Fiduciary (as defined herein), an independent third party who is empowered, among other things, to investigate and evaluate any claim of Mr. Rehme under the Rehme Notes.

14. About two years before the Company sought relief in this bankruptcy case, it began receiving complaints from some customers about rust appearing in certain legacy products fabricated from 1018 cold rolled steel. The Company worked with customers to address any such issues, including providing repairs and remediation, where appropriate. Despite these efforts, some former customers remained unsatisfied and filed lawsuits against the Company and others, including the unrelated companies that sold and installed the products manufactured by the Company.

15. While the Company is confident it would prevail in this litigation, and denies any liability, these lawsuits have created an extraordinary drain on Company profits as well as management's time and attention. The financial strain of the litigation has become unsustainable, and, to preserve its otherwise healthy business as well as the livelihood of its 44 employees, the Company has elected to reorganize through the bankruptcy process.

**DIP Facility**

16. Since the Petition Date, the Court authorized the Company to borrow up to $500,000 from Mr. Rehme on a post-petition basis. *See* Dkt. 72. Under the terms of the DIP Facility, amounts owed for advances made thereunder are secured by perfected liens on all the Company's assets and a super-priority administrative claim.

17. With respect to amounts advanced under the DIP Facility, the Company is only obligated during the Plan Period[1] to make monthly interest payments to Mr. Rehme. Mr. Rehme advanced funds under the DIP Facility at a 3% rate of interest, which is well below market interest rates. As of this filing, the Company has borrowed $250,000 under the DIP Facility.

**Projected Disposable Income**

18. The Plan is "fair and equitable" under section 1191 because it provides that "the value of the property to be distributed under the plan in the 3-year period . . . is not less than the projected disposable income of the debtor." 11 U.S.C. §1191(c)(2)(B). As discussed below, the projected disposable income during the Plan Period is $131,222, to be paid in three annual distributions to general unsecured creditors of $43,741, for a total of $131,223 (the "**Disposable Income**").

19. The Company previously projected income in its original Plan filed at Dkt. 4. Since then, the Company received substantial feedback from parties in interest. Creditors expressed skepticism of the Company's own financial projections, and the U.S. Trustee indicated that the Company was applying the wrong legal standard to determining whether plan payments are "fair and equitable" under § 1191(c). Specifically, the Company initially proposed paying creditors the disposable income actually earned during the Plan period. The Code requires paying creditors the projected disposable income determined and fixed as of the Effective Date of the Plan.

---

[1] "**Plan Period**" means three years from the Effective Date.

20.     With this feedback in mind, the Company retained financial advisors Harney Partners to calculate projected disposable income consistently with the Code and the case law.

21.     Disposable income is defined under the Code as income less "the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor." § 1191(d). Subchapter V does not itself provide guidance on how to determine "projected disposable income," but that identical phrase appears at § 1325(b), and has been widely interpreted and applied. That approach starts with historical results and amends them to "account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation." *Hamilton v. Lanning*, 560 U.S. 505, 524 (2010).

22.     Here, Harney Partners reviewed the Company's historical performance and its financial results during the pendency of the case. Harney projected sales based on growth rates over a historical baseline, informed by the Company's own projections and third-party industry forecasts. Harney then determined historical gross margin and operating margins, adjusting historical results to subtract the extraordinary expense of state-court litigation counsel, which will not continue during the Plan period. Harney further projected improvements in the margins over time to account for anticipated cost-savings initiatives and other factors. Last, Harney projected the costs of the Plan process, including professional fees and interest on the DIP Facility, which appear as "non-operating costs" in its model. The three-year Plan Period projections are summarized below:

| Projected Disposable Income | | | | |
|---|---|---|---|---|
|  | Yr 1 | Yr 2 | Yr 3 | Total |
| Revenue | 5,758,181 | 6,073,488 | 6,237,424 | 18,069,093 |
| *Revenue growth rate* | 9.1% | 5.5% | 2.7% |  |
| Gross profit | 1,614,747 | 1,723,265 | 1,769,779 | 5,107,791 |
| *Gross margin %* | 28.0% | 28.4% | 28.4% | 28.3% |
| Operating profit | 104,568 | 174,740 | 247,415 | 526,722 |
| *Operating margin %* | 1.8% | 2.9% | 4.0% | 2.9% |
| Non-operating costs | (357,500) | (19,000) | (19,000) | (395,500) |
| Disposable income | (252,932) | 155,740 | 228,415 | 131,222 |

23. The Plan requires the Company to make distributions of $43,741 for three years on the anniversaries of the Effective Date. These total payments of $131,223 account for the projected disposable income.

## Hypothetical Liquidation

24. The Plan is confirmable because, among other things, it provides that nonconsenting holders of impaired claims receive "value, as of the effective date of the plan, that is not less the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. §§ 1129(a)(7); 1191(b) (incorporating certain requirements of § 1129(a)). Under the Plan, general unsecured creditors will share in, at a minimum, annual distributions that account for the projected disposable income. In a liquidation, they would only get the liquidation value of the assets and there would be no projected disposable income.

25. The Company's assets as of the Effective Date of the Plan would include cash on hand, accounts receivable, inventory, other personal property and any causes of action, including chapter 5 claims. The cash projection is roughly the two-month rolling average cash on hand. Accounts receivable are valued at $0 because the Company can only collect receivables upon delivery of finished product, and the Company projects an inventory of no finished product as of the effective date of the Plan. Inventory and personal property are valued based on the estimated net liquidation value at auction for the items. The Company's own analysis of chapter 5 avoidance actions is that there are no such viable claims. However, as discussed below, the Plan contemplates empowering Catherine Curtis to investigate and pursue such claims in her capacity as Litigation Fiduciary.

| Liquidation Value of Assets | |
|---|---:|
| Cash | 60,000 |
| Accounts Receivable | - |
| Inventory | 20,700 |
| Other Personal Property | 76,025 |
| Avoidance Actions | - |
| **Total Estate Assets** | **156,725** |

26. These assets, however, have no value for creditors because they are encumbered by a perfected lien securing advances under the DIP Facility. [*See* Dkt. 72 at ¶ 3]. As of this filing, $250,000 has been advanced under the DIP Facility. As of the Effective Date of the Plan, as much as $500,000 may have been advanced. *Id.* ¶ 2. This secured liability far exceeds any reasonable estimate of the realizable value of the Company's assets in a hypothetical chapter 7 liquidation.

### Claims, Claims Resolution, and Claims Classification

27. **Claims Bar Date**. Proofs of Claims[2], asserting a claim against the Company, must be filed with the Clerk of the Court no later than **January 3, 2023** (the "**Claims Bar Date**"), as set forth on the Notice of Chapter 11 Bankruptcy Case. [*See* Dkt. 28]. The bar date for any governmental unit to file any proof of claim against the Company is March 13, 2023 (the "**Governmental Claims Bar Date**"), as set forth on the Notice of Chapter 11 Bankruptcy Case. [*See* Dkt. 28]. Any Proof of Claim that is not filed by the Claims Bar Date or the Governmental Claims Bar Date (respectively) are forever barred and/or disallowed in their entirety.

28. **Objections to Claims/Estimation of Claims**. All Proofs of Claims filed in this case are subject to objection, estimation and disallowance under the Bankruptcy Code and applicable law. Except for the authority expressly granted to the Litigation Fiduciary to object to claims of insiders, the Debtor has exclusive standing and authority to object to and/or seek to disallow or estimate any Proofs of Claim filed against the Company in this case. The deadline for the Debtor to object to and/or seek to disallow or estimate any Proofs of Claim is 180 days after the Governmental Claims Bar Date (the "**Claim Objection/Estimation Deadline**").

29. **Disallowed Claims**. For purposes of this Plan, a Claim is "**Disallowed**" if (i) it is scheduled by the Debtor as disputed, contingent, or unliquidated [*See* Dkt. 1] and no Proof of Claim

---

[2] A "Proof of Claim" is a signed statement describing a creditor's claim. A "Proof of Claim" form may be obtained at www.uscourts.gov or any bankruptcy clerk's office.

8

was filed by the applicable bar date; (ii) a Proof of Claim is not filed by the applicable bar date; and/or (iii) it has been objected to and disallowed by an order of the Bankruptcy Court.

30. **Allowed Claims**.  For purposes of this Plan, a Claim is "**Allowed**" if: (i) it is scheduled by the Debtor but not indicated as disputed, contingent, or unliquidated [*See* Dkt. 1] and if no objection to it has been filed by the Claim Objection/Estimation Deadline; (ii) a Proof of Claim was timely filed by the applicable bar date and no objection to it has been filed by the Claim Objection/Estimation Deadline; and/or (iii) if the Claim has been objected to and has been allowed by an order of the Bankruptcy Court.

31. **Estimation of Claims**.  The Debtor has exclusive standing and authority to seek an estimation of any claim that is contingent, disputed, or unliquidated for purposes of determining the "Allowed" amount of a claim for purposes of distribution under this Plan.

32. **Distribution to Holders of Allowed Claims**. Only creditors with Allowed Claims will receive a distribution of funds, as described in this Plan, on a pro-rata basis with other creditors in its class.  To the extent that any Claim has not been "Disallowed" or "Allowed" at the time a disbursement is due to be made by the Debtor under this Plan, the Debtor will establish an appropriate reserve.

33. **Administrative Expense Claims – Ordinary Course Expenses**.  All expenses of the Company, incurred in the ordinary course of operations from the Petition Date[3] through the Effective Date of the Plan, including expenses and claims of any governmental unit, shall be deemed allowed under 11 U.S.C. §503 and shall be paid in full according to ordinary terms.

34. **Administrative Expense Claims – Professional Fees/Expenses**. Any professional retained by the Debtor in this bankruptcy case pursuant to 11 U.S.C. §327 and/or §328 and the Sub-V Trustee (as that term is defined herein) shall file a final application for allowance of fees and

---

[3] The "**Petition Date**" is September 9, 2022.

reimbursement of expenses no later than 30 days after the Effective Date of the Plan. Professional fees and expenses allowed by an order of the Bankruptcy Court shall be deemed allowed administrative expenses under 11 U.S.C. §503(b)(2) and shall be paid in full by the Debtor on later of the Effective Date or upon entry of an order awarding any such professional fees and expenses.

35. **Classification of Claims**. Pursuant to section 1123(a)(1), the Plan designates the following classes of pre-petition claims:

| Classification | Description of Class | Members of Class | Estimated Size of Class | Treatment of Claims under Plan |
|---|---|---|---|---|
| Class 1 | Secured Claims | Allowed Secured Claims | None known. | Holders of Allowed Class 1 Claims retain their Pre-Petition lien rights, subject only to the lien rights granted Mr. Rehme under the DIP Facility. |
| Class 2 | Priority Unsecured Claims | Allowed Priority Unsecured Claims Under 11 U.S.C. §507 | None known. All obligations to employees were paid pursuant to Court order authorizing the Debtor to honor pre-petition employee obligations. The Debtor is not aware of any pre-petition tax claims or other priority unsecured claims that would be asserted against the Debtor. | Holders of Allowed Class 2 Claims shall be paid their *pro rata* share of Disposable Income (i) as it becomes available to the Debtor any time after the Effective Date of the Plan, at the discretion of the Debtor; or (ii) in three equal installments to be paid by the Debtor no later than the 1st, 2nd, and 3rd anniversary of the Effective Date. |
| Class 3 | General Unsecured Claims – Convenience Class | Allowed General Unsecured Claims of less than $2,000 | Currently, there are two claims that the Debtor believes will be in this class, with claims totaling approximately $2,000. | Holders of Allowed Class 3 Claims shall be paid in full by the Debtor no later than 30 days after the Effective Date. |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  | Most general unsecured trade creditors were paid as "critical vendors" with two exceptions. There are two trade/vendor claims scheduled by the Debtor [Dkt. 1] that were not treated as "critical vendors." The Debtor has remained current with its obligations on a post-petition basis and is not aware of nor does it anticipate any other creditors that would be in this class.  However, the Claims Bar Date has not passed and there is at least a theoretical possibility that a Proof of Claim could be filed by a creditor who would be included in this class. |  |
| Class 4 | General Unsecured Claims – Litigation Claims | Allowed General Unsecured Claims of Creditors with litigation claims against the Debtor relating to alleged defects in its discontinued product line. | Currently there are seven claims that the Debtor believes would be included in this class, with creditors asserting a claims of at least $7,222,344.[4] | Holders of Allowed Class 4 Claims shall be paid their *pro-rata* share of:<br><br>(a) Disposable Income -<br><br>(i) as it becomes available to the Debtor any time after the Effective Date of the Plan, at the discretion of the Debtor; or (ii) in three equal installments to be paid by the Debtor no later than the 1st, 2nd, and 3rd |

---

[4] The Debtor is not conceding it has any liability but presents this amount solely for purposes of disclosure in connection with this Plan and to advise interested parties of the potential size of claims within this class.

11

| | | | | |
|---|---|---|---|---|
| | | | | anniversary of the Effective Date.<br><br>(b) <u>Insurance Proceeds</u> -<br><br>(i) 30 days after receipt of any insurance proceeds marshalled by the Debtor under applicable policies but only after all Class 4 Claims have been allowed, disallowed, or estimated for purpose of distribution;<br><br>and<br><br>(c) <u>Net Litigation Proceeds</u> –<br><br>(i) During the Plan Period but only after all Class 4 and Class 5 Claims have been allowed, disallowed, or estimated for purposes of distribution. |
| Class 5 | General Unsecured Claims (Not Included in Class 3 or Class 4) | Allowed General Unsecured Claims of Creditors who do not have claims classified under Class 3 or Class 4 | Currently there is one claim that the Debtor believes would be included in this class, which is the claim of Mr. Rehme relating to the Rehme Notes. As of the Petition Date, the total amount of the Rehme Notes was $2,163,679.36. | Holders of Allowed Class 5 Claims shall be paid their *pro-rata* share of:<br><br>(a) <u>Disposable Income</u> -<br><br>(i) As it becomes available to the Debtor any time after the Effective Date of the Plan, at the discretion of the Debtor; or (ii) in three equal |

| | | | | |
|---|---|---|---|---|
| | | | | installments to be paid by the Debtor no later than the 1st, 2nd, and 3rd anniversary of the Effective Date; and (b) <u>Net Litigation Proceeds</u> – (i) During the Plan Period but only after all Class 4 and Class 5 Claims have been allowed, disallowed, or estimated for purposes of distribution. |
| Class 6 | Subordinated Claims | Any Allowed General Unsecured Claim that is subordinated to Class 3, 4, and 5. | None known. | Holders of Allowed Class 6 Claims shall be paid their *pro-rata* share of any remaining Disposable Income or Net Litigation Proceeds during the Plan Period but only after Classes 4 and 5 have been paid in full. |

### **The Sub-V Trustee**

36. Catherine Curtis, in her capacity as the trustee appointed under section 1183(a), ("**Sub-V Trustee**") will have appropriate access to the management, books and records and professionals of the Company to evaluate the Plan.

37. The Sub-V Trustee's term is anticipated to end upon substantial consummation of the Plan. The Plan shall be deemed substantially consummated on the Effective Date.

38. As permitted by section 1194(b), except as expressly provided otherwise herein, the Plan provides that the Debtor, will make all required payments under the Plan, thus resulting in administrative cost savings.

## The Litigation Fiduciary

39. There will be a Litigation Fiduciary empowered to administer chapter 5 avoidance actions and claims against insiders, if any, on behalf of the Estate. The Litigation Fiduciary's authority also includes the power to prosecute and/or settle any objections to claims of insiders. To be clear, the Litigation Fiduciary is not empowered to administer any other Litigation Assets other than those expressly stated in this paragraph.

40. Catherine Curtis will serve as the Litigation Fiduciary. The Litigation Fiduciary position will commence upon the Effective Date and will terminate after 180 days unless extended by the Court. The Litigation Fiduciary shall have the authority to engage professionals in her business judgment without further order of the Court. The Litigation Fiduciary may prosecute claims and enter into settlements in her business judgment without further order of the Court.

41. All proceeds or recoveries by the Litigation Fiduciary shall be property of the estate. Expenses of the Litigation Fiduciary shall be paid by the Debtor from property of the estate upon request by the Litigation Fiduciary without need for Court approval, but subject to Court resolution of any objections by the Debtor. The Debtor shall pay up to $20,000 in expenses of the Litigation Fiduciary from property of the estate. In the event the Litigation Fiduciary realizes affirmative recoveries, up to 50% of such gross recoveries may be used by the Debtor to pay expenses of the Litigation Fiduciary, with any remaining amounts payable to general unsecured creditors as distributions, subject to any applicable lien rights ("**Net Litigation Proceeds**").

42. The term, identity, authority, and all other aspects of the Litigation Fiduciary may be amended from time to time by Court order. No bond shall be required for service as Litigation Fiduciary. For the avoidance of doubt, the Litigation Fiduciary is not an agent under section 1194.

### Additional Plan Provisions

43. **Automatic Stay**. The automatic stay under 11 U.S.C. §362 remains in effect until the conclusion of the Plan Period or further order of the Court. For the avoidance of doubt, the stay remains in effect for all litigation pending as of the Petition Date.

44. **Corporate Form**. The Debtor is authorized to maintain its pre-petition corporate forms without modification. The Company is authorized to issue additional common stock and stock options in its discretion in the ordinary course of business.

45. **Discharge**. Following the end of the Plan Period, the Debtor shall promptly apply to the Court for a discharge as authorized under section 1192, provided, however, that secured claims shall be not be discharged and shall remain due and payable after the Plan Period.

46. **Effective Date**. The Effective Date shall occur within two business days of the date on which the Court enters an order confirming the Plan. On the Effective Date and subject to the terms of this Plan, the Debtor will assume the management of all of the property of the Company and will be responsible for all of its assets. The Debtor shall file a notice of the occurrence of the Effective Date on the docket in this case. The Plan shall be deemed substantially consummated on the Effective Date.

47. **Executory Contracts and Unexpired Leases**. Unless expressly rejected in this Plan or in any order confirming this Plan, the Company assumes all pre-petition executory contracts and unexpired leases as set forth on Schedule G [*See* Dkt. 1], including all current customer contracts and project engagements. No cure amounts are anticipated because there are no known defaults.

48. **Law and Venue**. The Plan is governed by Texas law. The United States Bankruptcy Court for the Southern District of Texas, unless it orders otherwise, shall retain jurisdiction over all aspects of this Plan and shall be the exclusive venue for disputes arising under the Plan or causes of action belonging to the Estate. The Debtor preserves its right to pursue discovery under Rule 2004 of the Federal Rules of Bankruptcy Procedure until the conclusion of the Plan Period.

49. **Modification**. Modification of the Plan is permitted only upon Court order and only as authorized under section 1193.

50. **Ordinary Course of Business**. The Debtor is authorized to continue operating in the ordinary course of business and to take all actions reasonably necessary to effectuate the Plan, but only in accordance with the terms of this Plan.

51. **Preservation of Litigation Claims**.  All claims and/or causes of action belonging to the Debtor, including but not limited to: (i) any counterclaims, cross-claims, defenses, affirmative defenses, rights of setoff, rights of contribution, and rights of indemnity arising from prepetition litigation filed against the Company or similar claims asserted against the estate as unsecured claims; (ii) chapter 5 causes of action, if any; (iii) claims or causes of action relating to coverage under any insurance policies of the Debtor; and (iv) any other causes of action, if any, arising against third parties, including but not limited to claims against insiders or affiliates of the Debtor (if any)(collectively, the "**Litigation Assets**").

52. **Vesting and Retention of Assets**. All assets of the Debtor's chapter 11 estate, including all Litigation Assets, shall remain property of the estate under 11 U.S.C. §541 and shall vest with the Debtor upon conclusion of the Plan Period.

**Confirmation of the Plan**

53. Section 1191(b) provides that the Court shall confirm a plan that meets the requirements of section 1129(a), other than paragraph (8), (10) and (15) of that section, "if the plan does not discriminate unfairly, and is fair and equitable" with respect to all impaired claims.

54. The Plan does not discriminate unfairly because similarly situated creditors are treated alike. The Plan is "fair and equitable" as defined in section 1191(c) because (1) the Plan provides that all projected disposable income be applied to Plan payments; (2) the Debtor is reasonably likely to be able to make all payments under the Plan.

55. The applicable requirements of section 1129(a) are addressed in the chart below.

| Section | Reason the Plan Complies |
|---|---|
| 1129(a)(1) | The Plan itself complies with applicable provisions of the Bankruptcy Code. |
| 1129(a)(2) | The Debtor as Plan proponent complies with applicable provisions of the Bankruptcy Code. |
| 1129(a)(3) | The Plan is proposed in good faith and not by any means forbidden by law. |
| 1129(a)(4) | Court approval is required for all payments for costs incurred prior to the Effective Date. |
| 1129(a)(5) | The Plan discloses the affiliations of all officers and directors and their proposed compensation. |
| 1129(a)(6) | Inapplicable because the Company does not charge rates that are subject to regulatory approval. |
| 1129(a)(7) | As demonstrated in the liquidation analysis, all classes of creditors receive no less under the Plan than under a chapter 7 liquidation. |
| 1129(a)(8) | Waived by section 1191(b). |
| 1129(a)(9) | All priority claims will be paid in full under the Plan on or before the Effective Date and as they come due during the Plan Period. |
| 1129(a)(10) | Waived by section 1191(b). |
| 1129(a)(11) | The Projections demonstrate the Plan is feasible and not likely to be followed by a liquidation or further reorganization. |
| 1129(a)(12) | All required fees have been paid or will be paid under the Plan. |
| 1129(a)(13) | The Company has no "retiree benefits" as defined in section 1114. |

| 1129(a)(14) | The Company has no domestic support obligations. |
|---|---|
| 1129(a)(15) | Waived by section 1191(b). |
| 1129(a)(16) | All retentions and transfers of property under the Plan comply with applicable law. |

Dated: November 11, 2022

| | |
|---|---|
| **Rehme Custom Doors & Lighting Inc. d/b/a Rehme Steel Windows & Doors** | **Jones Murray LLP** |
| */s/ Peter J. Rehme (with permission)* <br> Peter J. Rehme, Managing Member <br><br> **Debtor**. | */s/ Jacqueline Q. Chiba* <br> Erin E. Jones (TBN 24032478) <br> Christopher Murray (TBN 24081057) <br> Jacqueline Q. Chiba (TBN 24116899) <br> 602 Sawyer Street, Suite 400 <br> Houston, TX 77007 <br> Phone: 832-529-1999  Fax: 832-529-3393 E-mail: erin@jonesmurray.com <br> E-mail: chris@jonesmurray.com <br> E-mail: jackie@jonesmurray.com <br><br> **Proposed Counsel for the Debtor** |